## AFFIDAVIT OF MICHAEL MAZZARIELLO

STATE OF NEW YORK )
                  ) ss:s
COUNTY OF ORANGE )

1. I am an attorney admitted to the bar in 1990. I worked for the Brooklyn DA from 1990 to 1994 and then as Deputy Counselor to the Chancellor of the New York City Board of Education from 1995-1999. Thereafter, I have been in private practice focusing on criminal law.

2. I had an office at Stewart International Airport in 2005 when the Wollockos came to office. There had as yet been no charges against them. I began reviewing documentation concerning the Wollockos' situation. I conferred with attorneys with whom the Wollockos had an attorney- client relationship.

3. I brought the Wollockos into my new law firm, the Law Offices of Benjamin Ostrer, on August 15, 2005. By that time, there was no information filed against them. I was ill at that time and Mr. Ostrer was a well-known criminal lawyer in our area who I thought would be able to assist the Wollockos.

4. As soon as I brought the Wollocko case into the office, Ben Ostrer called attorney Barry Fallick, Esq., of New York City, and involved him as principal counsel in the case. I continued to have extensive contact with the case and attended numerous meetings concerning strategy.

5. During these meetings, Fallick repeatedly advised the Wollockos that Mr. Wollocko would plead guilty to a count of mail which involved arranging for a sale by his wife's company of computer software to Purdue. In exchange for this plea, Mr. Fallick repeatedly advised that Mr. Wollocko would receive a probation sentence and not be incarcerated. He also repeatedly

stated that the US Attorney's Office would not object to the restitution amount of $17,000 which represented the profit Mrs. Wollocko's company received on the aforecited transaction.

6. Before accepting the plea and allocuting on November 23, 2005, Mr. Wollocko was not advised that he was pleading guilty to mail fraud involving Purdue's acquisition of the XRPD machine for $245,000 or advised that his sentence would reflect any form of restitution relating to that transaction.

7. After accepting the plea, we received a draft pre-sentencing report which showed that the Probation Office was of the view that restitution in the case involved re-payment of monies Purdue claimed to have overpaid for the XRPD machine as a consequence of unfair dealings between Phillips, its seller, and Mr. Wollocko.

8. Upon learning that Probation held this view, I gathered materials which demonstrated that the Phillips transaction with Purdue was arms length and not influenced by Wollocko. In short, the price paid by Purdue for this machine was not inflated due to the Wollockos' influence. I heard Mr. Wollocko tell Mr. Fallick many, many times that he had not committed mail fraud or any other offense with regard to Purdue's initial purchase of the XRPD machine. Mr. Fallick transmitted some materials showing this to the Probation Department in late December 2005. **See**, Exhibit 1.

9. Sentencing was adjourned repeatedly as Probation was gathering more information from Purdue. In the meantime, I continued to work with Phillips' counsel who insisted that Phillips had not inflated the price as per the pre-sentence report.

10. In September 2006, we received the final pre-sentence report. It continued to inaccurately reflect that Wollocko had plead guilty to mail fraud with respect to the first transaction, something to which he never admitted, and was to be required to pay restitution with

regard to that, which entirely contradicted Fallick's repeated representations.

11. The final pre-sentence report is dated September 25, 2006. Upon its receipt, Mr. Wollocko called me, I went to his lab. He told me again that the amount of restitution was totally incorrect and that he was being charged for a matter to which he had not plead guilty. I asked my client to prepare a memorandum which would dissect the sentencing report and he did so. I provided this to Mr. Fallick. The content of the memo was repetitive: the client did not plead guilty to mail fraud with regard to the purchase by Purdue of XRPD and he never understood that this was part of either the plea or part or the sentence.

12. In this context, Artur was certainly cognizant that the amount of restitution claimed by the company, if accepted by this Court, would influence the guidelines range and likely sentence. I discussed with Artur the possibility of his withdrawing his guilty plea. However, Mr. Fallick explicitly advised Mr. Wollocko that this would be suicidal and that he was totally confident he would be sentenced to probation. Mr. Fallick stated clearly that for us to dispute any of the numbers would piss off everyone. The client and I both relied on Fallick's representations that the government would not dispute the sum of $17,000 as restitution. Only because of this representations did the client agree not to then withdraw his plea.

13. By the time of sentencing, Mr. Fallick was too ill to appear. Mr. Ostrer and I appeared on behalf of the defendant. Mr. Ostrer accepted the restitution sum set forth in the final probation report and the resultant calculation of the sentencing range, 18-24 months. As I was the junior lawyer on the scene, I did not object to these calculations. I understood that the client had never accepted responsibility for the transaction which caused this sum of restitution and the attendant sentence. To my observation and knowledge, Mr. Ostrer was not conversant with these issues as he had relied upon Mr. Fallick and Mr. Fallick had repeatedly expressed the

view that whatever the sum of restitution, there would be a probationary sentence. This was, to my knowledge, the client's understanding at the time of sentencing.

14. At sentencing, rather than accepting the computation as to restitution and the attendant sentence, Mr. Ostrer and I should have made clear to Your Honor that our client had not understood that he was pleading guilty to the more significant mail fraud count and that the sentencing and restitution computations were not acceptable. Failure to do so was not part of a coherent defense strategy.

_____
MICHAEL MAZZARIELLO

SIGNED AND SWORN TO BEFORE ME THIS 14th DAY OF SEPTEMBER 2007.

_____
NOTARY PUBLIC

MARY J. WHATELEY
Notary Public, State of New York
No. 4918265
Qualified in Orange County
Commission Expires 9/14/2011

# ROCHMAN PLATZER FALLICK STERNHEIM LUCA & PEARL, LLP
## 666 THIRD AVENUE
## NEW YORK, NEW YORK 10017

IRWIN ROCHMAN
KENNETH J. PLATZER
BARRY M. FALLICK
BOBBI C. STERNHEIM
SCOTT W. PEARL
PATRICIA A. LUCA
JILLIAN S. HARRINGTON
TRISHA LAFACHE

TEL. (212) 697-4090
FAX (212) 972-4654
verdictlaw@aol.com

184 EAGLE ROCK AVENUE
ROSELAND, NEW JERSEY 07068

December 29, 2005

David M. Sternberg
United States Probation Officer
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Re:    Artur Wollocko

Dear Mr. Sternberg:

Enclosed is the statement that Mr. Wollocko read to the Court during his plea allocution for Count One. The computer equipment was purchased by Purdue for $45,364.00 from the distributor through its agent IPBL. IPBL paid $27,464.00 for the equipment. The difference, $17,900.00, was the undisclosed commission.

In addition, while Count One also described a scheme to defraud Purdue by its purchase of the XRPD machine, Mr. Wollocko never allocuted to those allegations. Enclosed are self-explanatory documents concerning the purchase of the XRPD machine.

Furthermore, contrary to the allegations in the information, IPBL, which was solely owned by Hanna Wollocko [see enclosed documents] never received a free XRPD machine. They initially had a consignment and promotion agreement with Phillips Analytical, Inc. [see enclosed documents], which upon its expiration, led to a consignment agreement and eventual purchase of the XRPD machine [see enclosed documents].

Finally, I have enclosed a copy of the civil proceedings brought by Purdue against Artur Wollocko, which preceded the government's criminal case.

ROCHMAN PLATZER FALLICK STERNHEIM LUCA & PEARL, LLP

Thank you for your attention to these matters.

Very truly yours,

Rochman Platzer Fallick Sternheim
Luca & Pearl, LLP

By: _____
Barry M. Fallick

BMF:ce
Encls.

*Attorney – client priviledge*



**Philips Analytical Inc.**

October 10, 2001

*Via Federal Express*

Hanna Wollocko
President
IPBL
374 Pulaski Highway
Goshen, NY 10924

Dear Hanna,

Enclosed please find an original, duly executed Consignment and Promotion Agreement for your files.

Please let me know if you need anything further.

Regards,

Rik Kerstens
Marketing Manager

RK/jkp

Enclosure

CONFIDENTIAL
ATTORNEYS' EYES ONLY

IPBL 014132

12 Michigan Drive
Natick, MA 01760
Telephone 508-647-1100
Facsimile 508-647-1111
www.philips.com

## CONSIGNMENT and PROMOTION AGREEMENT

Philips Analytical Inc., a Delaware corporation, or its Assignee (LENDER), having an office at 12 Michigan Drive, Natick, Massachusetts 01760, and IPBL Company (BORROWER), having an office at 374 Pulaski Highway, Goshen, NY 10924, hereby make this agreement (the "Agreement"), concerning the mutual interest in promotion of X-Ray Diffraction Equipment into the pharmaceutical industry, (hereinafter called Promotional Activities). In order to facilitate these Promotional Activities, the LENDER will make available to the BORROWER a complete X-Ray Diffraction System, (hereinafter called Equipment) including all components listed in addendum A. In exchange:

1. The BORROWER agrees to cooperate with the LENDER in establishing X-Ray Diffraction as the preferred analysis method for drug validation and pharmaceutical process control. The BORROWER agrees to this support at no charge to the LENDER.

2. The BORROWER agrees to support the LENDER in the Promotional Activities as outlined in this agreement. The BORROWER agrees to this support at no charge to the LENDER.

3. The BORROWER agrees to create a bi-monthly management report for the LENDER on the progress and results of items 1 and 2 above, to allow LENDER justification of continuation of this agreement.

4. The BORROWER and LENDER shall sign a mutual Non-Disclosure Agreement related to the Promotional Activities and to the protection of the customers of the BORROWER and LENDER. This loan and consignment agreement is null and void without such NDA.

The BORROWER further agrees to the following general loan and consignment conditions related to the Equipment.

1. The Equipment remains the sole property of the LENDER and may not be sold, encumbered, lent or be used as collateral by the BORROWER. The Equipment shall only be used for the purposes set forth in this Agreement. BORROWER shall use a high standard of care in safeguarding and keeping the Equipment, and shall carry all risk insurances on it with a reputable, nationally known provider, at replacement value, naming LENDER as an additional insured.

2. This Agreement shall terminate 1 year from the date of the latest signature below.

3. The Agreement may be extended if mutually agreed in writing by the LENDER and BORROWER. Extension does not waive any claims or right of the LENDER towards the Equipment.

4. Either party may terminate this agreement at will by sending a 30 day written notice to the other.

5. This agreement shall automatically terminate upon BORROWER'S filing for bankruptcy, appointment of a receiver or trustee or upon insolvency. The LENDER maintains the right to retrieve the equipment and in no shape or form shall the Equipment become part of bankruptcy proceedings.

6. Upon termination for any reason, BORROWER shall return the Equipment, at its expense, in good condition, reasonable wear and tear excepted. Upon termination of this agreement, the BORROWER shall immediately cease all use of the Equipment unless otherwise agreed in writing by the LENDER.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

7. Upon termination of this agreement, the BORROWER shall grant the LENDER access to the premises of the BORROWER, to allow the LENDER to retrieve the Equipment. Reasonable dates and times for access shall be granted by the BORROWER within 5 business days of a request by the LENDER.

8. Upon failure to retrieve the Equipment by the LENDER within 4 months after termination of this Agreement, the BORROWER has the right to return the equipment to the LENDER at the expense of the LENDER. Failure to retrieve the Equipment by the LENDER, shall not waive any rights of the LENDER towards the Equipment.

The BORROWER further agrees to the following use, maintenance conditions related to the Equipment

1. The BORROWER may not unpack, assemble, disassemble, install nor move the Equipment at any time. The BORROWER shall request such actions from the LENDER to be executed by the LENDER or its appointees.

2. BORROWER may use the equipment in BORROWER'S ordinary course of daily operations, and no other. The BORROWER shall maintain the clean appearance of the Equipment and handle the components of the Equipment with a high standard of care and in any event no less a standard than a prudent owner would handle and treat their own equipment. BORROWER shall operate and maintain the Equipment in accordance to the guidelines, training and documentation provided by the LENDER.

3. The BORROWER shall maintain the clean appearance of the laboratory room in which the Equipment is installed according to the environmental specifications in the guidelines and will ensure sufficient space for service and demonstration access by the LENDER.

4. The BORROWER shall notify the LENDER of any Equipment failures as promptly as practicable but in any event not later than 5 business days. The LENDER shall repair the Equipment at no charge to the BORROWER, provided that the repair or damage was not caused by BORROWERS' abuse or misuse or BORROWER'S attempts to operate the equipment inconsistent with the guidelines or BORROWER'S attempts to move or repair the Equipment. LENDER may charge the BORROWER for the reasonable costs of repairs in such case.

5. The BORROWER shall grant the LENDER access to the premises of the BORROWER, to allow the LENDER to install and maintain the Equipment as required by the LENDER. Reasonable dates and times for access shall be granted by the BORROWER within 10 business days of a request by the LENDER.

The BORROWER further agrees to the following guidelines for support and involvement in the Promotional Activities. The BORROWER may decide on the level of support for the Promotional Activities listed below, with the condition that the LENDER may terminate the agreement immediately, without advance notice, if it deems the support and involvement of the BORROWER to be unsatisfactory.

1. The BORROWER shall grant the LENDER access to the premises of the BORROWER, to allow the LENDER to use the Equipment for sales support purposes, such as but not limited to demonstrations, customer lab work and training. Dates and times for access shall be granted by the BORROWER within 3 business days of a request by the LENDER.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

2. The BORROWER shall make best effort to measure and analyze pharmaceutical samples for the LENDER as requested by the LENDER. Reasonable dates and times for measuring and analyzing samples shall be granted by the BORROWER within 5 business days of a request by the LENDER.

3. The BORROWER shall make best effort to assist the LENDER in training pharmaceutical customers as requested by the LENDER. Reasonable dates and times for measuring samples shall be granted by the BORROWER within 5 business days of a request by the LENDER

4. Total access time requested to the BORROWER's facilities will not exceed 20% of business days per year (40 business days). Total support time requested from the BORROWER including demonstrations, applications and customer training support shall not exceed 20% of a man per year (40 working days). If LENDER requires additional support, BORROWER agrees to negotiate access and support compensation at reasonable rates.

5 The BORROWER shall produce IQ/OQ/PQ documentation for the Equipment within 6 months of the date of the latest signature below. The LENDER shall receive a copy and copyrights to the IQ/OQ/PQ documentation related to the Equipment as produced by the BORROWER within one month of completion. BORROWER shall assist, as reasonable, and sign such documentation as necessary to effect a transfer, at no additional cost to LENDER. Specific references to the BORROWER may be excluded from copyright as requested by the BORROWER in writing.

6. The BORROWER shall make best effort to participate in presentations at pharmaceutical shows and conferences as requested by the LENDER.

7. The BORROWER shall make best effort to promote the LENDER'S equipment in the BORROWER'S business activities over any competitive equipment. This pertains to but is not limited to articles, presentations and method development

8. The BORROWER shall disclose to the LENDER any competitive threats to the LENDER it may encounter.

9 The LENDER has an interest in obtaining information related to the intent of pharmaceutical companies to purchase X-Ray Diffraction Equipment (herein after called Sales Lead). The BORROWER shall expediently forward any Sales Lead it derives from the BORROWER'S business activities to the LENDER.

10. The BORROWER shall inform the LENDER of any new validation and process development methods that become of interest to pharmaceutical companies and that relate to the Equipment as they become known to the BORROWER

The LENDER agrees to the following guidelines for support and involvement in the BORROWER'S business activities.

1. The BORROWER has an interest in obtaining information related to the intent of pharmaceutical companies to contract measurement and analysis of samples (herein after called Contract Lead) The LENDER shall expediently forward any Contract Lead it derives from the LENDER'S business activities to the BORROWER

MISCELLANEOUS

1. Borrower is an independent entity and not the agent of Lender Borrower has no authority to enter into any agreement on Lender behalf. Borrower shall make no representations concerning the Equipment not authorized by Lender.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

2. LENDER IS PROVIDING THE EQUIPMENT AS IS AND MAKES NO WARRANTIES CONCERNING THE EQUIPMENT OR ITS USE. LENDER HEREBY DISCLAIMS ANY IMPLIED OR EXPRESS WARRANTIS, INCLUDING THOSE OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE. Borrower understands that the Equipment use is at its risk and it needs to run such verification tests as a re necessary to determine the suitability of the Equipment. Borrower shall indemnify, defend and hold harmless Lender from any claims, expense injury or damage arising out of its possession or us eof the Equipment. In no event shall Lender be liable hereunder for incidental, consequential, special, punitive or exemplary damages.

3. All notices hereunder must be in wiring and sent by certified mail return receipt requested, or by facsimile with proof of delivery to the addresses below:

If to

LENDER:

Philips Analytical, Inc.
Attn: Rik Kerstens
12 Michigan Drive
Natick, MA 01772

BORROWER:

*IPBL*
*374 PULASKI HIGHWAY*
*GOSHEN, NY 10924*

4. Governing law shall be that of the State of the New York, with jurisdiction in the Supreme Courts of New York State.

5. This agreement shall not be assigned by either party, except by Lender to a transferee of substantially all its assets.

6. No waiver shall operate by the passage of time. A waiver to occur shall only in writing by the party to be charged and then only with respect to the right so waived. No waiver shall operate as a continuing waiver

COMPANY: Philips Analytical Inc.
Signature _____
Name _Rik Kerstens_
Title _Marketing Manager_

Date _10/10/01_

COMPANY: IPBL Company
Signature _Hanna Wollocko_
Name _HANNA WOLLOCKO_
Title _PRESIDENT_

Date _9/27/01_

## CONSIGNMENT and PROMOTION AGREEMENT, ADENDUM A, EQUIPMENT LIST

LENDER shall provide the following equipment on loan to BORROWER under this agreement:

| Code | Description |
|---|---|
| PW3040/00 | Diffractometer Console |
| PW3373/00 | Ceramic Tube Cu LFF |
| PW3042/00 | Pedestal, Vertical |
| PW3050/10 | Goniometer, theta-theta vertical |
| PW3095/10 | Secondary Optics Interface, PW3050/10 (attached to 2nd arm) |
| PW3055/00 | Counterweight Interface (attached on the back to 2nd arm) |
| PW3055/11 | Counterweight, Single secondary optics (attached on the back to 2nd arm) |
| PW3057/00 | Sample Stage Interface for PW3050/10 (attached to the goniometer) |
| 920.02501 | Sample Stage for flat sample holders (shaft attached to goniometer interface) |
| PW1172/01 | Holder, sample, PW1170, set of 20 (10 used) |
| PW3123/00 | Curved Monochromator, Secondary Cu |
| PW3011/10 | Proportional detector MPD |
| PW3716/10 | Dual Scaler Board (DS) (built in the electronics rack) |
| PW1311/50 | HT Cable, 2.0m (built in) |
| PW3081/00 | Programmable Divergence Slit (built in) |
| PW3085/00 | Soller Slit 0.02rad (it is an extra set of 2 Soller, set of 0.04 rad also included) |
| PW3091/00 | Programmable Antiscatter Slit (built in) |
| PW3093/00 | Programmable Receiving Slit (built in) |
| PW3713/10 | Multiple DC Motor Drive (built in the electronics rack) |
| PW3713/10 | Multiple DC Motor Drive (built in the electronics rack) |
| 500.27841 | TTK-450 Camera plus TCU-100 Temperature Controller (built into console) |
| PN3766/64 | Water flow controller (built in at the bottom of console) |
| 500.20221 | Adapter: TTK-450 ->PW3050/10 T-T (built into TTK camera) |
| 500.20241 | Adapter: TTK-450 ->PW3050 T-T (built into TTK camera) |
| 500.27851 | Liquid Nitrogen Delivery Equipment (built into console) |
| 500.20141 | Dewar vessel, Nitrogen, TTK |
| PN1767/30 | Verification Standard for TTK |
| 500.20121 | Vacuum System, TTK (Press. Gauge strapped to pedestal, vac. pump & hoses and fittings as separate items) |
| 500.20371 | THC Temperature Humidity Chamber System |
| 500.20221 | Adapter: TTK-450 ->PW3050/10 T-T (built into THC camera) |
| 500.20381 | VTI Humidity Controller |
| 500.20391 | Neslab temperature bath |
| 500.20401 | VTI heatable hose |
| PW1338/07 | Cable PC to instrument |
| PW3210/92 | X'pert Organizer software (applab license) |
| PW3200/92 | X'pert Data Collection software (applab license) |
| PW3201/92 | X'pert Graphics software (applab license) |
| PW3202/92 | X'pert Identify software (applab license) |
| PW3209/92 | X'Pert High Score (applab license) |
| PW3205/82 | Profit profile fitting software (applab license) |
| PW3207/92 | X'pert Plus software (applab license) |
| PN3191/00 | R-100 bcks air cooled water chiller, 3.15kW |

Note: Computer with 3 serial ports and HP Deskjet printer to be supplied by BORROWER.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

10/03/2005  13:24   8455672711                OXYVITA INC                        PAGE  15



# PURCHASE ORDER

Date:  4/29/05           PO #:    PO429050821

TO:
Bruce Roberts
PANalytical Incorporated
12 Michigan Drive, Natick, MA 01760
Tel: 508 647 1100
Fax: 508 647 1115

FROM:
OXYVITA INC.
108 World Trade Way
New Windsor, NY 12553
Tel: 845 567 2710
Fax: 845 567 2711

| Row | # | Description | Unit Price | Tot Price |
|---|---|---|---|---|
| 1 | 1 | Philips X'Pert Pro Theta-Theta X-Ray Diffraction System as per Quotation No:122204BR01 dated 12/22/04 | 79,900.00 | 79,900.00 |
|   |   | Total |   | $79,900.00 |

_signature_
OXYVITA INC.
4/29/05

PANalytical Incorporated

10/03/2006  10:24  8455572711                OXYVITA INC                        PAGE 12

# Quotatio

**PANalytical Incorporated**
12 Michigan Drive, Natick, MA 01760
Tel: (508) 647 1100  Fax: (508) 647 1115

Date: __December 22, 2004__

Hanna Wollocko
IPBL
108 World Trade Way
New Windsor, NY 12553

Quotation No.: __122204BR01__   Page __1__

Inquiry No.: _____

PANalytical is pleased to submit its quotation for the products contained hereunder. This proposal shall not bind PAnalytical until accepted by it in writing at its principal office in Natick, MA upon the terms and conditions stated on the face and reverse hereof. This quotation is valid for 30 days from date hereof unless otherwise specified.

| Item | Qty. | Catalog Number | Description | Price |
|---|---|---|---|---|
|  |  |  | *Philips X'Pert Pro Theta-Theta X-Ray Diffraction System* |  |
|  |  |  | *This system is presently on consignment to IPBL* |  |
| 1 | 1 | PW3040/00 | DIFFRACTOMETER CONSOLE |  |
| 2 | 1 | PW3373/00 | CERAMIC TUBE CU LFF |  |
| 3 | 1 | PW3042/00 | PEDESTAL VERTICAL |  |
| 4 | 1 | PW3050/10 | GONIOMETER Theta-Theta |  |
| 5 | 1 | PW3095/10 | SECONDAY OPTICS INTERFACE |  |
| 6 | 1 | PW3055/00 | INTERFACE, COUNTERWEIGHTS |  |
| 7 | 1 | PW3055/11 | COUNTER WEIGHT |  |
| 8 | 1 | PW3057/00 | SAMPLE STAGE INTERFACE |  |
| 9 | 1 | 920.02501 | SAMPLE STAGE FOR FLAT SAMPLE HOLDER |  |
| 10 | 1 | PW1172/01 | HOLDER, SAMPLE PW1170 |  |
| 11 | 1 | PW3123/00 | CURVED MONOCHROMATOR SECONDARY CU |  |
| 12 | 1 | PW3011/10 | PROPORTIONAL DETECTOR, 20x24MM |  |
| 13 | 1 | PW3716/10 | DUAL SCALER BOARD (DS) |  |
| 14 | 1 | PW1311/50 | HT CABLE 2.0M |  |
| 15 | 1 | PW3081/00 | OPTICS, PREFIX PROGRAMMABLE DIVERGENCE LINE |  |
| 16 | 1 | PW3085/00 | SOLLER SLIT 0.02 |  |
|  |  |  | *Is an extra set of 2 soller. Set of 0.04 rad also included* |  |
| 17 | 1 | PW3091/00 | PROGRAMMABLE ANTI-SCATTER SLITS |  |
| 18 | 1 | PW3093/00 | PROGRAMMABLE RECEIVING SLITS, PREFIX |  |
| 19 | 2 | PW3713/10 | MULTI DC MOTOR DRIVE |  |
| 20 | 1 | 500.27841 | TTK-450 Camera with controller |  |

This quotation supersedes all previous quotations, negotiations, statements, representations and promises and is valid for 30 days from the date hereof.

Terms of Delivery: N/A                          By: _____

Terms of Payment: Net 30 ARO

Representative: Bruce Roberts
PANalytical                                Tel (609) 81
12 Michigan Drive                          Fax (609) 81
Natick, MA 01760

Page 9

10/03/2005 10:24   9455672711   OXYVITA INC   PAGE 13

# Quotation

...lytical Incorporated
...chigan Drive, Natick, MA 01760
(508) 647 1100  Fax: (508) 647 1115

Date: December 22, 2004

Hanna Wollocko
IPBL
108 World Trade Way
New Windsor, NY 12553

Quotation No.: 122204BR01   Page 2

Inquiry No.: _____

PANalytical is pleased to submit its quotation for the products contained hereunder. This proposal shall not bind PAnalytical until accepted by it in writing at its principal office in Natick, MA upon the terms and conditions stated on the face and reverse hereof. This quotation is valid for 30 days from date hereof unless otherwise specified.

| Item | Qty. | Catalog Number | Description | Price |
|---|---|---|---|---|
| 21 | 1 | PN3766/64 | *Water flow controller* | |
| 22 | 1 | 500.20221 | *Adapter TTK-450* | |
| 23 | 1 | 500.20241 | *Adapter TTK-450* | |
| 24 | 1 | 500.27851 | *TTK-450 Liquid nitrogen Delivery Equipment* | |
| 25 | 1 | 500.20141 | *Dewar Vessel, Nitrogen 10L for TTK* | |
| 26 | 1 | PW1767/30 | *Verification Sample for RHC* | |
| 27 | 1 | 500.20121 | *Vacuum equipment for TTK Camera* | |
| 28 | 1 | 500.20371 | *THC TEMPERATURE HUMIDITY CHAMBER* | |
| 29 | 1 | 500.20221 | *Adapter TTK-450* | |
| 30 | 1 | 500.20381 | *VTI, Humidity Controller* | |
| 31 | 1 | 500.20391 | *THC Camera Temperature Bath* | |
| 32 | 1 | 500.20401 | *VTI Heatable Hose* | |
| 33 | 1 | PW1338/07 | *Cable* | |
| 34 | 1 | PW3210/92 | *X'PERT Organizer* | |
| 35 | 1 | PW3200/92 | *X'PERT Data collector* | |
| 36 | 1 | PW3201/92 | *X'PERT Graphics* | |
| 37 | 1 | PW3202/92 | *X'PERT Identify* | |
| 38 | 1 | PW3209/92 | *X'PERT HIGHSCORE* | |
| 39 | 1 | PW3205/82 | *PROFIT SW* | |
| 40 | 1 | PW3207/93 | *X'PERT PLUS* | |
| 41 | 1 | PN3191/00 | *R100 BKS AIR-COOLED CHILLER, 3.15Kw* | |

This quotation supersedes all previous quotations, negotiations, statements, representations and promises and is valid for 30 days from the da hereof.

Terms of Delivery: N/A

By: _____

Terms of Payment: Net 30 ARO

Representative: Bruce Roberts
PANalytical   Tel: (809) 812
12 Michigan Drive   Fax:(609) 812
Natick, MA 01760

10/03/2006  10:24   8455672711         OXYVITA INC                    PAGE  14

_alytical Incorporated_                                           # Quotation
_ichigan Drive, Natick, MA 01760_
(508) 647 1100  Fax: (508) 647 1115

                                       Date:  December 22, 2004

Hanna Wollocko                         Quotation No.: 122204BR01      Page 3
IPBL
108 World Trade Way
New Windsor, NY 12553                  Inquiry No.:

PANalytical is pleased to submit its quotation for the products contained hereunder. This proposal shall not bind PAnalytical until accepted by it in writing at its principal office in Natick, MA upon the terms and conditions stated on the face and reverse hereof. This quotation is valid for 30 days from date hereof unless otherwise specified.

| Item | Qty. | Catalog Number | Description | Price |
|---|---|---|---|---|
|  |  |  | *DISCOUNTED SYSTEM PRICE* | $79,900 |
| 42 | 1 | Installation |  | $6,000 ✓ |
|  |  |  | *TOTAL SYSTEM PRICE INSTALLED NO WARRANTY* | $85,900 |
| 43 | 1 | 1Year Service Contract |  | $11,427 ✓ |

*This proposal is valid until 1-31-05*

This quotation supersedes all previous quotations, negotiations, statements, representations and promises and is valid for 30 days from the date hereof.

Terms of Delivery: N/A                    By:_____

Terms of Payment: Net 30 ARO              Representative: Bruce Roberts
                                          PANalytical                  Tel: (609) 812-8
                                          12 Michigan Drive            Fax:(609) 812-8
                                          Natick, MA 01760

10/03/2005  10:24    8455672711           OXYVITA INC                         PAGE  16

## Statement
## PANalytical


PANalytical

Your customer number: US116280

OXYVITA, INC.
108 WORLD TRADE WAY
NEW WINDSOR, NY 12553
USA

PANalytical Inc.
12 Michigan Drive
Natick, MA 01760
United States

Our TAX ID No.: 45-0483849

Date: 05/20/05                Page: 1 of 1

| Inv.date | Invoice | Customer PO | Document | Curr. | Amount | Amount Open | Due date |
|---|---|---|---|---|---|---|---|
| 04/27/05 | IN96527 | 0429050821 | Invoice | usd | 86,491.75 | 86,491.75 | 05/27/05 |
| 05/12/05 | IN97035 | 0429050821 | Invoice | usd | -6,591.75 | -6,591.75 | 06/11/05 |

Total Amount Open:  79,900.00
Payment Unapplied:       0.00
usd   Total:       79,900.00

Total Contested:   0.00

| Current | Past Due  1 | Past Due  30 | Past Due  60 |
|---|---|---|---|
| 79,900.00 | 0.00 | 0.00 | 0.00 |

*Paid $ 79,900.00*
*wire transfer on 6/30/05*

10/05/2006  10:24    8455672711              OXYVITA INC                           PAGE   17

# PROVIDENT BANK
400 RELLA BOULEVARD, MONTEBELLO, NY 10901
(845) 369-8040
FUNDS TRANSFER PAYMENT ORDER

DATE  6/30/05                                BRANCH  24 - Blooming Grove

BENEFICIARY BANK ABA #  021000021

BENECICIARY BANK ABBREVIATION _____

BENEFICIARY BANK NAME  JP Morgan Chase Bank NA
            ADDRESS  One Bank One Plaza Chicago IL 60670

AMOUNT $  79,900.00              PRODUCT CODE (See Below)  CTR

CREDIT TO:  PANalytical                      ACCOUNT #  0915486

BANK TO BANK INFORMATION (PLEASE PRINT)

_____

CUSTOMER'S (SENDER'S) NAME  Oxyvita Inc.           ACCOUNT # 0221425051
OTHER INFORMATION (SENDER)  Hanna Wollocko
FEE DOLLAR AMOUNT$  20.00

TO THE EXTENT NOT PROHIBITED BY LAW, THE UNDERSIGNED AGREES THAT THIS FUNDS TRANSFER IS IRREVOCABLE. THE SOLE OBLIGATION OF PROVIDENT BANK IS TO EXERCISE ORDINARY CARE IN EXECUTING THIS PAYMENT ORDER. PROVIDENT BANK IS NOT RESPONSIBLE FOR ANY LOSSES OR DELAYS WHICH MAY OCCUR AS A RESULT OF ANY OTHER PARTY'S CONDUCT, INCLUDING CUSTOMER'S (SENDER'S) CONDUCT, IN PROCESSING THIS FUNDS TRANSFER.

NOTICE: THE BENEFICIARY'S BANK MAY MAKE PAYMENT BASED UPON THE BENEFICIARY'S ACCOUNT NUMBER LISTED ABOVE, EVEN IF IT IDENTIFIES A PERSON DIFFERENT FROM THE NAMED BENEFICIARY. IT IS THE CUSTOMER'S (SENDER'S) RESPONSIBILITY TO INSURE THAT ALL INFORMATION ON THIS PAYMENT ORDER IS ACCURATE.

                                    Hanna Wollocko
                                    CUSTOMER'S SIGNATURE

B/Babcock
INFORMATION TAKEN BY (SIGNATURE)                 APPROVED BY (SIGNATURE)
                        PRODUCT CODES
              BTR/   BANK TRANSFER          DRW/   DRAWDOWN
              CTR/   CUSTOMER TRANSFER      FFR/   FED FUND RETURNED
              DEP/   DEPOSIT TO SENDER'S ACCT FFS/  FED FUND SOLD

******************** FOR BACK OFFICE USE ONLY ********************

OFAC CHECKED BY _____          ACCOUNT DEBITED _____

APPROVED BY _____              WIRE REFERENCE # _____

WIRE SENT BY _____             VERIFIED BY _____

CUSTOMER CALLBACK COMPLETED _____