# ROCHMAN PLATZER FALLICK STERNHEIM LUCA & PEARL, LLP
## 666 THIRD AVENUE
## NEW YORK, NEW YORK 10017

IRWIN ROCHMAN
KENNETH J. PLATZER
BARRY M. FALLICK
BOBBI C. STERNHEIM
SCOTT W. PEARL
PATRICIA A. LUCA
JILLIAN S. HARRINGTON
TRISHA LAFACHE

TEL. (212) 697-4090
FAX (212) 972-4654
verdictlaw@aol.com

184 EAGLE ROCK AVENUE
ROSELAND, NEW JERSEY 07068

## FAX FORM

**TO:** Benjamin Ostrer, Esq./Michael Mazzariello, Esq.

**FAX #:** 845-469-8690

**FROM:** Barry M. Fallick, Esq.

**DATE:** September 25, 2006

**RE:** Wollocko

**TOTAL NUMBER OF PAGES (including cover sheet):** 22

See attached PSI. I will call you tomorrow.

**IMPORTANT NOTICE:** This transmission is intended only for the use of the individual/entity to which it is addressed and may contain information which is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee/agent responsible for delivering this entire facsimile to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately at 212-697-4090 and return the original facsimile to us at the above address by mail. Thank you.



48067

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### PROBATION OFFICE

## PRESENTENCE INVESTIGATION REPORT

| UNITED STATES OF AMERICA | ) | **Docket No.:** 05 CR 1235-01 (SCR) |
|---|---|---|
| vs. | ) | |
| Artur Wollocko | ) | **Sentence Date:** October 18, 2006 |

---

| | |
|---|---|
| **Prepared For:** | Honorable Stephen C. Robinson<br>U.S. District Judge |
| **Prepared By:** | David M. Sternberg<br>U.S. Probation Officer<br>(914) 390-4051 |

**Assistant U.S. Attorney**
Elliott B. Jacobson
(914) 390-1940
E-mail: Elliott.Jacobson@usdoj.gov

**Defense Counsel**
Barry M. Fallick, Esq.
Rochman Platzer Fallick Sternheim Luca & Pearl, LLP
666 Third Avenue
New York, NY 10017
(212) 697-4090
E-mail: verdictlaw@aol.com

**Offense:**   <u>Count 1:</u>   Mail Fraud, 18 USC 1341, Class D felony // Maximum 5 years' imprisonment; 3 years' supervised release; fine of the greater of $250,000 or twice the gross gain or loss; $100 special assessment[1]

          <u>Count 2:</u>   Conspiring to Acquire and Obtain Possession of a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception and Subterfuge, 21 USC 846 [21 USC 812 and 843(a)(3)], Class E felony // Maximum 4 years' imprisonment; maximum 1 year supervised release; maximum fine of $30,000; $100 special assessment

**Release Status:**    The defendant voluntarily surrendered on November 23, 2005, and was released on his own recognizance.

---

[1] It should also be noted that at the time Counts 1 was committed this was a D felony. Current violations of 18 USC 1341 are C felonies.

| | | | | |
|---|---|---|---|---|
| Detainers: | None | | | |
| Codefendants: | None | | | |
| Related Cases: | None | | | |
| Identifying Data: | | | | |

| | | | |
|---|---|---|---|
| Date of Birth: | October 10, 1956 | Age: | 50 |
| Race: | White | SSN: | 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 |
| Sex: | Male | FBI No: | 661620KC8 |
| Marital Status: | Married | NYSID No: | None |
| Education: | Masters' Degree | USM No: | 84456-054 |
| Dependents: | Four | Other ID No: | (BICE) A027890288 |
| Address: | 23 Sleepy Hollow Road | Citizenship: | U.S. (Naturalized) |
| | Monroe, NY 10950 | | |

**Date Prepared:** September 19, 2006                    **Date Revised:**

**Restrictions on Use and Redisclosure of Presentence Investigation Report.** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Federal Bureau of Prisons is authorized by the U.S. District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

Wollocko, Artur                                                                    P48067 - DMS

3

## PART A.    THE OFFENSE

### Charge(s) and Conviction(s)

1.    Information 05 CR 1235-01 (SCR) was filed in the Southern District of New York on November 23, 2005.

2.    Count 1 charges that in 2000, in the Southern District of New York, Arthur Wollocko devised a scheme to defraud Purdue Pharma L.P. and caused mail matter to be mailed to and from Purdue's premises in Ardsley, NY in furtherance of the scheme.

(18 USC 1341 and 2)

3.    Count 2 charges that in 2003, in the Southern District of New York and elsewhere, Arthur Woolocko and a co-conspirator conspired to unlawfully acquire and obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception and subterfuge in violation of 21 USC 812 and 843(a)(3).

(21 USC 846)

4.    On November 23, 2005, the defendant appeared before the Honorable Lisa Margaret Smith in the Southern District of New York and pleaded guilty to the above charges without the benefit of a plea agreement. Sentencing is scheduled for October 18, 2006.

5.    Pursuant to the suggestion of the Court in United States v. Pimentel, the Governments position regarding the application of the Sentencing Guidelines in this case is as follows:

    A.    Mail Fraud

        i.    The applicable guideline is §2B1.1, which carries a base offense level of six.

        ii.    Pursuant to §2B1.1(b)(1)(E), the offense level is increased by eight levels, because the amount of loss is between $70,000 and $120,000.

        iii.    Because the defendant was an organizer, leader, manager, or supervisor in the criminal activity, the offense level is increased by two levels.

        iv.    Because the defendant abused a position of trust, the offense level is increased by two levels, pursuant to §3B1.1(c).

Wollocko, Artur

4

P48067 - DMS

    v.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to §3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional one-level reduction is warranted, pursuant to §3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

    vi.    Based on the foregoing, the defendant's offense level with respect to the Mail Fraud charge is 15.

**B.**    <u>Narcotics Violation</u>

    i.    The applicable guideline for the offense is §2D2.2 and results in a base offense level of eight.

    ii.    Assuming the defendant enters a plea of guilty that is acceptable to the Court and clearly demonstrates a recognition and affirmation of personal responsibility for his criminal conduct, a two-level reduction in the offense level will be warranted, pursuant to §3E1.1(a).

    iii.    In accordance with the above, the defendant's offense level with respect to the ~~tax~~ offense is 6. *Narcotics*

**C.**    <u>Grouping Analysis</u>

    i.    Since the total offense level for Count 2 is nine or more levels less serious than the total offense level for Count 1, the applicable offense level is not increased, pursuant to §3D1.4 (c). As such, the total offense level is 15.

**D.**    <u>Criminal History</u>

    i.    Based upon information now available to the Government (including representations by the defense), the defendant has no criminal history, and therefore has a Criminal History Category of I.

Wollocko, Artur                                                      P48067 – DMS

5

E.    Sentencing Range

    i.    Based upon the calculations set forth above, the defendant's
          sentencing range is 18 to 24 months and the applicable fine range is
          $4,000 to $40,000.

F.    Restitution

    i.    Restitution in the approximate amount of $80,000 must be ordered.

The Offense Conduct

6.    The investigation into the criminal conduct of Artur Woolocko was conducted by the Federal
      Bureau of Investigation (FBI) and the U.S. Drug Enforcement Administration (DEA).

Background

7.    Purdue Pharma L.P. (Purdue) is a pharmaceutical company that is engaged in the research,
      development, production and distribution of pharmaceutical products.

8.    From December 15, 1997, until his termination on April 22, 2003, Woolocko was employed
      at Purdue as a senior scientist in the pharmaceutical analysis department in Ardsley, NY. As
      a member of Purdue's pharmaceutical analysis department, Wollocko had access to
      confidential information about those technologies and methodologies, but additionally had
      responsibility for evaluating, developing and validating new technologies and analytical
      procedures for use by Purdue. Those technologies and analytical procedures included
      methods for using x-ray powder diffraction (XRPD) for pharmaceutical analysis. Wollocko
      was also responsible for the development and adaptation of computer software and systems
      that support those analytical procedures.

9.    X-ray powder diffraction (XRPD) is a technology used by manufacturers of high tech
      industrial materials, such as silicon wafers and electronic components, and in metallurgy.
      During the first year of his employment at Purdue, Woolocko assumed responsibility for
      investigating the potential purposes for which XRPD technology could be used in
      pharmaceutical analysis; identifying and evaluating vendors of XRPD laboratory services and
      equipment; negotiating arrangements for Purdue to contract for XRPD laboratory services,
      and for the use (and eventual purchase) of XRPD equipment; adapting XRPD technology for
      use in pharmaceutical analysis; conducting and evaluating tests of the XRPD technology with
      samples from several different Purdue research projects; and developing and validating
      methodologies for using XRPD in pharmaceutical analysis.

Wollocko, Artur                                                     P48067 - DMS

6

10. Woolocko, and his wife Hanna Wollocko (a/k/a Hanna Y. Wollocko, M.D., Hanna K. Wollocko, Yvonne Wollocko, and Yvonne Konkolowicz, M.D.), for several years had been operating their own private pharmaceutical business under a series of assumed and entity names, including International Pharmaceutical and Biotechnology Laboratories (IPBL) and AABJY Professional and High-Tech Center Corporation (AABJY). On October 12, 1999, the defendant's wife filed a business certificate in Orange County, NY indicating that she was doing business under the name of International Pharmaceuticals and Biotechnology Laboratories. Mrs. Woolocko subsequently filed a certificate of discontinuance of business on December 30, 2002. IPBL Phamaceuticals was incorporated in Delaware on November 5, 2001. A review of the certificate of incorporation revealed that the defendant and his wife were listed as stockholders. The defendant informed the probation department that IPBL was dissolved in 2004. International Pharmaceuticals and Biotechnology Laboratories, LLC a New York Limited Liability Company filed articles of organization on March 7, 2002. The defendant's wife was listed as the processor. In 2003, the defendant's wife founded Oxyvita. According to Woolocko, since February 2005, he has been employed as the project director at Oxyvita.

The investigation

Mail Fraud - Count 1

11. On February 8, 2000, pursuant to Woolocko's recommendation, Purdue purchased an XRPD system (also known as an x-ray powder diffractometer), from Philips Analytical, for a price of $245,646. The system was delivered to Purdue in October 2000.

12. Unbeknownst to Purdue, which trusted Wollocko, this price was way above market for the machine. Also unbeknownst to Purdue, was Woolocko's family relationship with IPBL; Wollocko arranged for Philips Analytical to supply IPBL with another XRPD system at no cost to IPBL.

13. As a result of undisclosed arrangements between Wollocko and co-conspirators at Philips, Purdue was overcharged for the XRPD system and in exchange, IPBL received a virtually identical XRPD system, free of charge, for use in the business that the Wollockos operate under the name IPBL. Philips' delivery of a substantially identical XRPD system to the Wollockos without charge, at approximately the same time that Philips, by arrangement with Wollocko, sold the XRPD system to Purdue for $245,646, indicates that the price Wollocko caused Purdue to pay to Philips for the XRPD system was roughly double the fair price for that machine (i.e., that Purdue was overcharged approximately $122,823 for the XRPD system).

Wollocko, Artur                                                          P48067 – DMS

7

14.   Once Purdue discovered from another scientist that they were paying too much for the XRPD system, they were able to negotiate a deep discount from the supplier to make up for Wollocko's scheme.

15.   Approximately one year after Woolocko had caused Purdue to purchase the first XRPD system, Purdue complained to Philips Analytical that they had been overcharged and negotiated the purchase of a second XRPD machine for only $85,000, less than half the price that Woolocko had caused Purdue to pay for the first system. Documents obtained from the Government indicate that the written quotation specifies $85,000 of the total sale price was for the purchase of the second system; $14,057 was for the purchase of optional equipment for that second system; $26,862 was for the purchase of options for the first XRPD system. A $5,000 credit was applied per the agreement, as well as an additional discount of $3,000. In addition, Philips agreed to provide an additional credit of $500, as well as $10,215 in free campilary components. As such, Philips provided total credits of $19,012 to Purdue.

16.   Another aspect of this scheme involved Wollocko's role as a salesman for a computer company - also unbeknownst to his Purdue employer. Wollocko arranged for his computer company's product to be placed inside of the XRPD system. This resulted in Wollocko making a commission on the sale of the XRPD system to Purdue. The computer equipment was purchased by Purdue to $44,114 from the distributer through its agent IPBL. IPBL paid $36,264 for the equipment. The difference, $7,850, was the undisclosed commission.

17.   The probation department determined that the loss in this case is $122,823 [half the value of what Purdue paid for the XRPD machine] + undisclosed commission $7,850 = $130,673.

Conspiring to Acquire and Obtain Possession of a Controlled Substance by Misrepresentation, Fraud, forgery, Deception and Subterfuge- Count 2

18.   In early 2002, a former Purdue employee informed Purdue management that during a visit to IPBL they had seen containers with Purdue markings that may have contained oxycodone, a controlled substance. Purdue conveyed this information to the DEA.

19.   During the course of the investigation it was learned that after its formation, IPBL maintained a website under the internet domain name "WWW.ipbl.org." IPBL's website stated, among other things, that IPBL was "...registered with the DEA and approved to handle narcotic (CII) products." In fact, as Woolocko knew, IPBL was not registered with, or approved by, the DEA to handle narcotic products.

Victim Impact

20.   The victim in this case is Purdue Pharmam L.P, which is seeking restitution in the amount of $111,661. According to the Government, although the intended loss was $130,673, certain

Wollocko, Artur                                                                P48067 - DMS

8

credits need to be applied for restitution provided to Purdue by Philips. As noted above, approximately one year after Woolocko had caused Purdue to purchase the first XRPD system, Purdue complained to Philips Analytical that they had been overcharged and negotiated the purchase of a second XRPD machine. Pursuant to that agreement, Philips agreed to provide Purdue with a number of credits based upon Purdues' complaint of being overcharged for the first XRPD machine. As such, Purdue was charged $85,000 for the purchase of the second system (This system was reportedly a scaled down version of the XRPD system); $14,057 was for the purchase of optional equipment for that second system; $26,862 was for the purchase of options for the first XRPD system (total value of agreement $117,919). Philips also provided Philips with a $5,000 credit which was applied per the agreement, as well as an additional discount of $3,000. In addition, Philips agreed to provide an additional credit of $500, as well as $10,215 in free campilary components for the first XRPD system. As such, Philips provided total credits of $19,012 to Purdue. As such, less credits of $19,012, total restitution due to Purdue is $111,661.

## Adjustment for Obstruction of Justice

21.  The probation officer has no information to suggest that the defendant impeded or obstructed justice at the time of the arrest, or during the investigation or prosecution of the offense.

## Adjustment for Acceptance of Responsibility

22.  At the time of the presentence interview on December 27, 2005, the defendant upon the advice of counsel declined to discuss his actions in the instant offense. However, he subsequently provided us with a copy of the statement he read to the Court during his plea allocution. He also provided us with additional information about his actions in the offense in letters dated December 29, 2006, and January 10, 2006.  In his letters and statement, Wollocko asserted that in terms of Count 1, that during the course of his employment at Purdue he recommended that Purdue purchase an x-ray powder diffraction machine. In addition he recommedned that Purdue purchase computer equipment for use with the XRPD machine from International Phamaceuticals and Biotechnology Laboratories (IPBL), a company that he and his family were associated with. He knowingly and willfully failed to inform Purdue of his family's interest in IPBL and also failed to inform Purdue that IPBL received a commission from the sale of the computer equipment. He acknowledged that his employment contract required him to inform Purdue of this information. Woolocko also asserted in his letter that "...The computer equipment was purchased by Purdue for $44,264 from the distributer through its agent IPBL. IPBL paid $27,563.92 for the equipment. The difference, $17,900, was the undisclosed commission. Woolocko asserted that IPBL, which he claimed is solely owned by his wife, never received a free XRPD machine. According to Woolocko, they initially had a consignment and promotion agreement with Phillips Analytical, Inc., which upon its expiration, led to a consignment agreement and eventual purchase of the XRPD machine. The defendant provided us with a copy of an invoice from

Wollocko, Artur                                                      P48067 - DMS

9

Phillips and funds transfer payment order that Woolocko claims indicated that on June 30, 2005, Oxyvita Inc. paid Phillips $79,900 for the XRPD machine. A review of the both these documents showed that neither document referenced the XRPD machine.

23. A review of the consignment and promotion agreement between Phillips analytical and IPBL which was signed by the defendant's wife on September 27, 2001, revealed that IPBL received the XRPD machine in return for promotional activies. The equipment was to remain the sole property of Phillips.

24. In terms of Count 2, Woolocko wrote in part: "...I agreed with another person to violate the narcotics laws of the United States by having IPBL maintain a website stating that the company was approved by the Drug Enforcement Administration to handle narcotic products, when in fact the approval for the company from the DEA was still pending."

25. The defendant also provided us with a copy of a letter dated January 26, 2006, which was addressed to the Court. In his letter the defendant expressed remorse for his actions and asked the Court to "...look kindly at my actions as a result of not fully understanding the implications and as a result of my very active life. I want to assure you that it was a mistake, not a planned, intentional action."

Offense Level Computation

26. The November 1, 2005 edition of the Guidelines Manual has been used in this case.

27. Count 1 cannot be grouped with Count 2, pursuant to §3D1.2, as they represent separate harms. As such, because Count 1 and 2 represent two groups of distinct Conduct the two groups will be separately addressed and then computed per §3D1.4.

Count 1 - Mail Fraud

28. **Base Offense Level:** The guideline for a violation of 18 USC 1341 and 2 is found in §2B1.1 and calls for a base offense level of six, pursuant to §2B1.1(a). _____ 6

29. **Specific Offense Characteristic:** Section 2B1.1(b)(1) provides for an incremental increase in the offense level if the loss exceeded $5,000. As noted in the offense conduct section of the report the total loss was $130,673, which results in an increase of 10 levels, pursuant to §2B1.1(b)(1)(F).                                                                                      +10

30. **Victim-Related Adjustments:** None.                                                        0

Wollocko, Artur

P48067 - DMS

31.  **Adjustments for Role in the Offense:** Wollocko abused his position of private trust which enabled him to commit the offense. As such, a two level increase is warranted, pursuant to §3B1.3.

+2

32.  **Adjustment for Obstruction of Justice:** None.

0

33.  **Adjusted Offense Level (Subtotal):**

18

<u>Count 2-</u> (Conspiring to Acquire and Obtain Possession of a Controlled Substance by Misrepresentation, Fraud, forgery, Deception and Subterfuge)

34.  **Base Offense Level:** The guideline for a violation of 21USC 846 is found in §2D2.2, which provides for a base offense level of eight.

8

35.  **Specific Offense Characteristic:** None.

0

36.  **Adjustments for Role in the Offense:** None.

0

37.  **Adjustment for Obstruction of Justice:** None.

0

38.  **Adjusted Offense Level (Subtotal):**

8

<u>Multiple Count Adjustment</u> (See §3D1.4)

| | | Units |
|---|---|---|
| 39. Adjusted Offense Level for Count 1 | 18 | 1 |
| 40. Adjusted Offense Level for Count 2 | 8 | 0 |
| 41. Total Number of Units | | 1 |
| 42. Greater Adjusted Offense Level | 18 | |
| 43. Increase in Offense Level | 0 | |

44.  **Combined Adjusted Offense Level:**

18

45.  **Adjustment for Acceptance of Responsibility:** Based on the defendant's statement and plea of guilty before the Court, we believe the defendant has shown recognition of responsibility for the offense. Further, due to the defendant's timely notification of his intention to plead guilty, allowing the Government to allocate its resources more efficiently, and since the offense level is 16 or greater, pursuant to §3E1.1(a) and (b), the offense is reduced three levels.

-3

Wollocko, Artur                                                    P48067 - DMS

11

| 46. | **Adjusted Offense Level:** | <u>15</u> |
|---|---|---|
| 47. | **Chapter Four Enhancements:** None. | <u>0</u> |
| 48. | **Total Offense Level:** | <u>15</u> |

## PART B. DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudications

49.     None.

### Adult Criminal Convictions

50.     According to the FBI and the New York State Division of Criminal Justice Services, Bureau of Identification, the defendant has no prior criminal convictions.

### Criminal History Computation

51.     The defendant has no known criminal convictions.  Therefore, the defendant has zero criminal history points and a Criminal History Category of I.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

52.     As corroborated by a copy of a birth certificate provided by the defendant, Arthur Mieczyslaw Wollocko, was born on October 10, 1956, in Radzymin, Poland. He is the only child born to the marital union of Mieczyslaw Woolocko, a tailor who died in 1992, at age 68, and Irena Rasinska, age 79, a housewife who resides in Miami, FL. At the time of the presentence interview, Woolocko indicated that his mother was traveling in Poland.

53.     Wollocko reported that he was reared by both parents and characterized his childhood as very happy. He indicated that his parents provided for all his material needs during his childhood. He said that he was never abused and neither of his parents abused drugs or alcohol. He specifically noted that his father did not drink or smoke.

54.     As corroborated by a marriage certificate provided by the defendant, in 1981, Wollocko married Hanna Yvonne Konkolowicz, now age 49, in Poland. The defendant's wife is self-employed as the owner and chief executive officer of Oxyvita Incorporated (established in February 2003). There are three children resulting from this marriage, they are: Jacek, age 23, who works with the defendant and his wife and is attending graduate school; Arthur, age

Wollocko, Artur                                                                 P48067 - DMS

12

16, a high school student; and Brian, age 9, a fourth grade student. All three children reside at the case address. Wollocko reported that his wife and children are all in good health.

55.   At the time of the presentence interview on December 27, 2005, the defendant was asked to give an account of all the places he has resided since birth. He reported that he has resided at the case address with his family since 1995. From 1991, until 1995, he resided in Greenlake, NY. From 1988, from 1991, he resided in Bronx, NY. Woolocko reported that from 1987, until 1988, he resided in Vienna, Austria. From birth until 1987, he resided in Poland.

56.   Wollocko related that he immigrated to the U.S. in 1988, with his wife and eldest son in order to pursue employment opportunities here in the U.S. Information received on February 8, 2006, from the Department of Homeland Security, Bureau of Immigration Customs Enforcement (BICE) indicated that the defendant entered the U.S. on September 26, 1988, and is a "Naturalized U.S. citizen [Certificate No. 0022501891]" and is not subject to removal. A review of the Certificate of Naturalization provided by Wollocko revealed that he was granted citizenship on December 12, 1997.

57.   On December 27, 2005, we interviewed the defendant's wife in the probation office. She characterized the instant case as a "big mistake, not intentional" and added that the defendant has not "...done anything wrong before." She related that she and the defendant have been living under a great deal of stress for the past three years. She said that she has trouble sleeping, often feels upset and experiences headaches. She feels uncertain about the furture.

58.   She expressed her concern that her husband may be sentenced to a term of imprisonment. She noted that they share a business together, Oxyvita, and she said, "We have been putting all of our time into this business, lots of debt, it's a critical time for the company." She indicated that the defendant is a critical component of the company and is now working on a difficult project.

59.   Mrs. Woolocko also expressed that she and the defendant share a very close relationship. He also shares very close relationships with his children. She is worried that the defendant's incarceration would especially impact her 16 year old son, Arthur as this is a crucial stage in Arthur's life. She also noted that Arthur will need help next year to select a college. She also reported that Woolocko reads with his youngest son, Brian, every night. She indicated that at present only their eldest son, Jacek knows about the instant case.

60.   Finally, Mrs. Woolocko hopes that the Court is lenient at the time of sentencing and in the event he is sentenced to a term of imprisonment that he is designated to a local facility to enable frequent family contacts.

Wollocko, Artur                                                      P48067 – DMS

13

61.   On February 6, 2006, and February 21, 2006, the defendant provided us with copies of letters from various family members, coworkers and friends that were addressed to the Court. A review of these letters revealed that they all attested to Wollocko's good character.

Physical Condition

62.   The defendant stands 6' 1" tall, weighs 230 pounds and has blue eyes blond hair (some greying). Woolocko reported, and we observed, no scars or tattoos.

63.   The defendant reported that at age 21, he had his gall bladder removed. He indicated that he is in good health.

Mental and Emotional Health

64.   The defendant reported having no history of mental or emotional illness, nor having sought or required treatment from a mental health professional. We have no information which indicates otherwise.

Substance Abuse

65.   The defendant disclaimed the use of illegal drugs. He also indicated that he rarely drinks alcohol and then only to the extent of proposing a toast .

66.   On December 27, 2006, the defendant submitted to urinalysis for illegal drugs; the results were negative.

Education and Vocational Skills

67.   As corroborated by a copy of a diploma provided by the defendant, in 1985, the defendant graduated with a masters degree in chemistry from the Politechnika Warszawska, located in Warsaw, Poland. He did not indicate where he completed his undergraduate work.

68.   As corroborated by a copy of a diploma provided by the defendant, in 1975, the defendant graduated from the Liceum Ogolnoksztalcacego, a high school located in Poland.

69.   Woolocko indicated that in addition to his native Polish he is completely fluent in English. He also indicated that he is literate in Russian and German and can converse in both those languages to a limited extent.

Wollocko, Artur                                                          P48067 – DMS

14

### Employment

70.    The defendant reported that since February 2005, he has been employed as project director earning an annual salary of $60,000 at Oxyvita Inc., located at 108 World Trade Way, New Windsor, NY. The defendant's wife is the president of this company. As noted in the offense conduct section of this report, Woolocko, and his wife Hanna Wollocko (a/k/a Hanna Y. Wollocko, M.D., Hanna K. Wollocko, M.D., Yvonne Wollocko, and Yvonne Konkolowicz, M.D.), for several years had been operating their own private pharmaceutical business under a series of assumed and entity names, including International Pharmaceutical and Biotechnology Laboratories (IPBL) and AABJY Professional and High-Tech Center Corporation (AABJY). On October 12, 1999, the defendant's wife filed a business certificate in Orange County, NY indicating that she was doing business under the name of International Pharmaceuticals and Biotechnology Laboratories. Mrs. Woolocko subsequently filed a certificate of discontinuance of business on December 30, 2002. IPBL Phamaceuticals was incorporated in Delaware on November 5, 2001. A review of the certificate of incorporation revealed that the defendant and his wife were listed as stockholders. The defendant informed the probation department that IPBL was dissolved in 2004. International Pharmaceuticals and Biotechnology Laboratories, LLC a New York Limited Liability Company filed articles of organization on March 7, 2002. The defendant's wife was listed as the processor. In 2003, the defendant's wife founded Oxyvita. In his financial statement, he owns 23,000 shares of Oxyvita, and his wife owns 2,002,000 shares. At the time of the presentence interview, Woolocko reported that Oxyvita is developing a product that will replace the need for whole blood transfusions. He described it as a powdered blood substitute.

71.    The defendant reported that from January 2004, until February 2005, he was employed as group leader earning an annual salary of $120,000 at the Lannett Company, a pharmaceutical company located at 9000 State Road, Philadelphia, PA. He indicated that he was responsible for developing and improving methodologies for new products. He said that he resigned because of professional differences he had with the director of his department.

72.    As verified, from December 15, 1997, until April 22, 2003, the defendant was employed as a senior scientist earning an annual salary of $60,000 at Purdue Pharma located at 444 Saw Mill River Road, Ardley, NY. Wollocko was terminated from his position at this company based upon his actions in the instant offense. Furthermore, it was during the course of this employment that the defendant committed the instant offense.

73.    It should be noted that on May 12, 2003, Purdue commenced a civil action against Wollocko and his wife in Westchester County Supreme Court (Index No. 07733/03). Purdue alleged that the Wollocko's stole confidential and proprietary information and intellectual property from Purdue that is worth millions of dollars. This case remains pending.

Wollocko, Artur

P48067 - DMS

15

74.  As verified, from December 3, 1990, until December 5, 1997, Wollocko was employed as a chemical analyst earning an annual salary of $48,700 at Barr Pharmaceuticals, located at 223 Quaker Road, Pomona, NY. On February 16, 2006, we received a response to our written inquiry for information from this employer's payroll coordinator. However, other than being informed that Wollocko resigned, his salary, and dates of employment; no further information was provided in terms of his character and performance. At the time of the presentence interview, Wollocko reported that he left this job for better opportunities. He said that he had been the "lead analyst in research and development."

75.  The defendant reported that from 1989, until 1990, he was employed as a research scientist at Columbia University/Psychiatric Institute at Presbyterian Medical Center, located on West 168th Street, New York, NY. He left this position to work for Barr Pharmaceuticals.

76.  Wollocko reported that from 1982, until 1988, he worked for his family's carpet manufacturing company in Poland, the Kilimiarstano Carpet Company. He noted that his wife's aunt, and wife's family is still operating this business in Poland. He indicated that he has no financial interest in this company.

Wollocko, Artur                                                    P48067 – DMS

Financial Condition: Ability to Pay

77.    Assets

        **Cash**

| | |
|---|---|
| Checking Account( Joint checking) | 1,206.00 |
| Retirement Account(s) | 4,849.00 |
| **Subtotal:** | **$6,055.00** |

        **Assets**

| | |
|---|---|
| Motor Vehicles | 6,500.00 |
| **Subtotal:** | **$6,500.00** |

        **Other Assets**

| | |
|---|---|
| Real Estate | 400,000.00 |
| **Subtotal:** | **$400,000.00** |

        **Total Assets:**                      **$412,555.00**

        **Debts**

| | |
|---|---|
| Credit Cards | 57,258.00 |
| Home Mortgage | 301,582.00 |
| **Total Debt:** | **$358,840.00** |

        **NET WORTH:**                        **$53,715.00**

78.    In his financial statement, he owns 23,000 shares of Oxyvita, and his wife owns 2,002,000 shares. He did not list a fair market value for these shares.

79.    Woolocko also reported that he owns 30 percent of International Pharmaceuticals and Biotechnology Laboratories, LLC and his wife owns 60 percent. He did not list a fair market value for these shares.

80.    He also reported that he owns 40 percent of AABJY Professional and High-tech Center Corporation, and his wife owns 60 percent. He indicated that this company is in the process of dissolution.

Wollocko, Artur

17

P48067 - DMS

81.  Woolocko indicated that he is the subject of two pending civil suits. He reported that on May 12, 2003, Purdue filed suit against him in Westchester County Court. He also reported that he is being sued by an attorney, Frank Peluso. The defendant provided no information in terms of the suit with Peluso.

### Monthly Cash Flow

#### Income

| | |
|---|---|
| Defendant's Net Salary | 3,755.00 |
| Spouse's Net Salary | 3,848.00 |
| **Total Income:** | **$7,603.00** |

#### Necessary Living Expenses

| | |
|---|---|
| Property Mortgage | 2,992.00 |
| Food | 1,000.00 |
| Utilities | 515.00 |
| Telephone | 129.00 |
| Transportation | 340.00 |
| Credit Card(s) | 1,576.00 |
| Life Insurance | 32.00 |
| Car Insurance | 290.00 |
| Clothing | 100.00 |
| Medical | 60.00 |
| **Total Expenses:** | **$7,034.00** |

### NET MONTHLY CASH FLOW:                                  $569.00

82.  The defendant provided us with copies of his federal income tax returns for the years 2000 through 2004. What follows is a table summarizing the defendant's tax data for the past five years. The information was consistent with the data we received from the Internal Revenue Service on March 8, 2006.

Wollocko, Artur                                                              P48067 – DMS

18

| Year | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|
| Tax Form | 1040 | 1040 | 1040 | 1040 | 1040 |
| Filing Status | Married Filing Joint Return | Married Filing Joint Return | Married Filing Joint Return | Married Filing Joint Return | Married Filing Joint Return |
| Exemptions | 4 | 5 | 5 | 5 | 5 |
| Wages, Salaries, Tips, etc. | $110,234 | $47,811 | $84,742 | $80,105 | $78,685 |
| Business Income | - | - | <-$39,965> | <-$31,018> | $2,018 |
| Capital Gains | $119,851 | - | - | - | - |
| Income or loss from Partners and S Corporations | <-$71,916> | <-$20,592> | <-$19,012> | <-$18,599> | <-$16,005> |
| Adjusted Gross Income | $158,169 | $48,204 | $25,765 | $32,700 | $64,612 |
| Refund | $2,590 | $7,306 | $11,070 | $11,152 | $8,997 |

83.    An Equifax Credit Systems inquiry dated February 7, 2006, revealed that the defendant has $29,318 in revolving credit card debts, and $306,562 in installment debts primarily comprised of a $300,000 mortgage loan. The defendant also has a $50 debt owed to Verizon which was charged-off.

## PART D. SENTENCING OPTIONS

### Custody

84.    **Statutory Provisions:** The maximum term of imprisonment for <u>Count 1</u> is five years, pursuant to 18 USC 1341.

85.    **Statutory Provisions:** The maximum term of imprisonment for <u>Count 2</u> is four years, pursuant to 21 USC 846.

Wollocko, Artur

P48067 - DMS

19

86.  **Guideline Provisions:** Based on a total offense level of 15 and a Criminal History Category of I, the guideline range for imprisonment is 18 to 24 months.

Supervised Release

87.  **Statutory Provisions:** In the case of Counts 1, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years, pursuant to 18 USC 3583(b)(2). In the case of Count 2, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than one year, pursuant to 18 USC 3583(b)(3).

88.  Such terms of supervised release run concurrently, pursuant to 18 USC 3624(e).

89.  **Guideline Provisions:** In the case of Count 1, the guideline range for a term of supervised release is at least two years but not more than three years, pursuant to §5D1.2(a)(2). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to §5D1.1(a). In the case of Count 2, the guideline range for a term of supervised release is one year, pursuant to §5D1.2(a)(3). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to §5D1.1(a).

Probation

90.  **Statutory Provisions (All Counts):** The defendant is eligible for not less than one nor more than five years' probation by statute, pursuant to 18 USC 3561(c)(1). Because the offense is a felony, one of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service, pursuant to 18 USC 3563(a)(2).

91.  **Guideline Provisions:** Because the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation, pursuant to §5B1.1, application note #2.

Fines

92.  **Statutory Provisions:** The maximum fine for Count 1 is $250,000, pursuant to 18 USC 3571. The maximum fine for Count 2 is $30,000, pursuant 21 USC 843(b)(3) and (d)(1). A special assessment of $100 (total $200) is mandatory, pursuant to 18 USC 3013.

Wollocko, Artur                                                          P48067 - DMS

20

93.    **Guideline Provisions:** The fine range for the instant offense is from $4,000 to $40,000 pursuant to §5E1.2(c)(3)(A) and (B).

94.    Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $1,952.66 to be used for imprisonment, a monthly cost of $287.50 for supervision, and a monthly cost of $1,736.98 for community confinement.

       Restitution

95.    **Statutory Provisions:** Full restitution to the victim is required under 18 USC 3663A and 18 USC 3664. Restitution in the amount of $111,661 is owed to and should be forwarded to Purdue Pharma L.P. to the attention of:

              Robin Abrams, Esq.
              Vice President, Associate General Counsel
              Purdue Pharma L.P.
              One Stamford Forum
              Stamford, CT 06901

96.    **Guideline Provisions:** Pursuant to §5E1.1(a)(1), in case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss if such order is authorized under 18 USC 3663A.

Wollocko, Artur                                                    P48067 - DMS

21

## PART E.  FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE

97.    The probation officer has no information concerning the offense or the offender that
       would constitute additional factors which would impact on sentencing.


                                              Respectfully submitted,

                                              Chris J. Stanton
                                              Chief U.S. Probation Officer


                                    By:     _____
                                              David M. Sternberg
                                              U.S. Probation Officer
                                              (914) 390-4051

Approved:


_____        September 19, 2006
Kenneth Greenblatt                           Date
Supervising U.S. Probation Officer